Third argument is docket number 24-1958, Causam Enterprises, Inc. v. ecobee Technologies ULC. Mr. Helge, welcome back. Thank you, Your Honor. Please begin. May it please the Court. Thank you, Your Honor. Your Honor, we are now talking about the 268 patent, which Your Honor has obviously heard quite a bit about during the ITC argument. The Board's final written decision includes two flaws that we contend are fatal. One is an incorrect construction. Once again, the Board adopted a construction that eliminated the requirement that the generated measurement and verification data correspond to the reduction of consumed power. We can get into that in quite a bit, but I think it's more important also to address the fact that there is also an ownership issue here that is, I think, maybe a little bit more important than it was in the 592. Oftentimes, as a patent owner, we don't know what a petitioner thinks about ownership. This case is not that case. This is a very unusual case because we had the petitioner telling everybody, including this Court, including the ITC, Causam does not and has never owned the 268 patent. The problem here is that the Board was made aware of this problem, this issue, and did not resolve it. It did not reach a determination. There is a footnote on page one of the petition that says ECOB understands there's an issue with ownership or a challenge of ownership without owning up to its own involvement in that challenge. I think this is a case where both the Board and petitioners might benefit from this Court's education about how disputes should be resolved regarding ownership. Because, as your Honors know, Causam has gone through the entire process, the entire IPR process. We would contend that we are the owner. We do contend we're the owner. But to the extent that there is another owner out there, or to the extent that the Board concludes that we're not the owner, that should have been decided early. And it wasn't. And we would contend— So let me sort of reprise what I think I was suggesting in the previous— And I'm sorry, I cannot see you at the moment. Something went wrong. I can hear you, so we can just proceed. For this issue, if we apply the Five Genics summary judgment standard, what we have is you've alleged that you're the patent owner, you're the recorded assignee, and no contrary facts. Under the summary judgment standard, that's enough. We're done with any kind of Article III problem, perhaps. There was a question about whether this argument you make about what ECOB should have said. We do not actually think that a person would be named— Your picture is back now, thank you. It is— Except I think maybe it's completely frozen. Okay, now it's actually— Sorry, I wasn't listening. I'm sorry for the mechanics. So it's a reviewability question, right? Whether this is— Whether review of this argument you make about what ECOB should have said and what the board should have demanded of them is reviewable. But just on the Article III standing, why isn't it perfectly plain that under the Five Genics standard, it's enough for you to be here? So, Your Honor, I think you're right. And from the perspective of constitutional standing, I agree that the 592 in this case come out the same. I think if we're going to look at that Five Genics standard— So then let's go to the argument that you make about what ECOB should have said and what the board should have demanded of ECOB seems to be reviewable because it is not actually a 312 argument. It's not an argument that some element of 312 is wrong because you cannot find in 312 a requirement that the petitioner assert what it believes to be the patent owner. An argument that would be 312 is if you asserted you're not the patent owner and ECOB has not identified the patent owner, but you haven't made that argument for obvious reasons. So it seems to me this is a kind of argument about what the board should have done in the course of trying the case, which is not an institution matter. So, Your Honor, I would— And also just to complete the loop and also walk through that piece. Okay. So, Your Honor, I would say that what we have in terms of establishing Article III standing here is equally important in terms of assuring that constitutional obligations of notice and opportunity to be heard to any interested party in an in-rem proceeding like a PTAB proceeding. Also require a party like ECOB to come forward and say, we think there's some other party that owns the patent. We don't think the party that we've drawn into this proceeding owns the patent. We want to go forward with them, but we think there's somebody else out there. And I think this is, again, 99.9% of the cases this is never going to be an issue. This is a really odd situation because we know what ECOB thinks through the ITC case. Much like the Worlds v. Bungie case that dealt with RPI and the proper naming of RPI, there is an obligation— Right, except the difference between this and the RPI case is that in the RPI case, the argument was made, there is a missing RPI. You're not saying there's a missing patent owner. Correct, Your Honor, although we're alerting the board that another party thinks there's a missing patent owner. Well, let's put it this way, Your Honor. I think there is a harm to a party who comes in and says, we own a patent. And a petitioner says, well, we don't think you do, but we're going to put you through the process. There's a harm in the sense that there is some value, some benefit to quiet title for the PTO to say, we're going to look at the operative documents, we're going to make a decision, and we're going to say, yes, this IPR can proceed against this party because we do agree that you are a patent owner here, which also gives this court evidence and a record to review so that we aren't in the situation like we were with the 592 patent where we're saying, gosh, does this agreement issue create standing in this case or not? A fulsome record is beneficial at the PTAB. But unfortunately here we didn't have one because the petitioner, who does have an obligation of candor with the tribunal, frankly hid their position on ownership, hid the evidence, hid their arguments, even though there was fulsome briefing at the ITC. Judge Rontra, I understand your point, kind of the so what. We would submit that when there is a dispute, again, 99% of the time or more, this is not going to come up. But when it does come up, the board should go through the process to make sure all interested parties have been notified and alerted. What if in the ITC appeal we were to conclude that COSM owns this patent? Then would this argument that you're raising right now go away? I think so, Your Honor. I think so. We've been teasing that out quite a lot, trying to figure that question out. I think it does go away. Standing here is established. The only thing I would say, Your Honor, is if we're addressing it from this phygenic standard, which is summary judgment, is that quite title? Is it going to be precluded? Is there effectively judicial estoppel from ECOB later saying, hey, we do have an issue with title? I don't think it's quite determinative fully, but I think this argument goes away. Moving on, Your Honor, to a maybe more interesting topic, which is claim construction. I'm sorry. What's the status of Claim 12? It's not part of this IPR, right? I think that's right, Your Honor. Claim 12 is not in. I think it's Claim 1 and 14 are the independent claims that are at issue here. 1 through 11 and 13 through 19 are what was ruled on. I think that's right. That's the only missing claim. But the reason I ask is that if Claim 12, for some reason, has been canceled or something like that, then if you were to reach the merits and rule against you here, there really isn't much public benefit in quieting title because the patent is dead. Except, Your Honor, I would respectfully say that if we do have Claim 12 alive, there is a reissue procedure we could go through if we so chose. And that's what I'm asking. Tell me about the status of Claim 12. So, Your Honor, I'm not aware of any plans to go through reissue. I think Claim 1 is the most important because of the ITC case, of course. But I think owning Claim 12, it's owning Claim 12. That would be good, too. We would like that. Your Honor, from the intervening counsel's argument during the ITC hearing, I heard counsel say that measurement verification data, the generating measurement verification data, has to correspond to the reduction in consumed power. And that's what the claim requires. And we agree with that. However, in this IPR proceeding, the board effectively rewrote the corresponding two terms to read, instead, generating measurement verification data before the reduction in consumed power. Because, again, we're talking about Figure 1C of Eller's, where you're taking a measurement beforehand, then going through the process of the demand response period. Our position is that the correspondence has to occur. Now, the board said they recognize, first of all, they recognize the antecedent basis that comes in Element 1, here we're calling it 1B, where the reduction in consumed power results from disabling the power to the power-consuming device. So there's a trigger that gets you to that reduction in consumed power. Element 1C requires generating measurement verification data corresponding to the reduction. But this – Eller's, as we already spoke about earlier, uses this measured and verified language itself. And the board then, at A42, consulted the AEIC document, just as it had earlier, to understand measurement and verification, as that term is used in the claim. And then concluded, well, Eller's is disclosing this limitation, and because it's directed to the same thing, that was defined by the AEIC document. So what's wrong with that basic analysis? So, Your Honor, let me, if I can, split these two concepts. One is the measurement and verification process, which, again, we don't dispute that Eller's says measured and verified. But the data that goes into the process is where I think we have a problem with Element 1C of the 268 patent in this proceeding. What the board found is that Eller's discloses, I think they say, Eller's suggests that measurement and verifications are – I'm sorry, this is Dr. Ostlander – but Eller's suggests that measurement and verification methods are used. We don't dispute that, because Eller's says measured and verified. But the question for 1C, the operative question, is the data that is used for measurement and verification, when is that generated? The board says we recognize there has to be a correspondence, but we say it's not time, and we don't tell you what it has to be. So the question is, what is it? How does data that's generated before a reduction in consumed power, how does that correspond to it? The board doesn't explain that. I'm sorry, can I – why is it truly – tell me why it's more complicated than this? You're talking about turning off a device. So you know, without having to measure, that there's zero out during the actual event. To figure out what a saving is, you need some figures about what it otherwise would have been. So of course, just by all of the historical data or whatever else you've used before, the before event is the comparator, and that is corresponding to – it's at least corresponding to, because corresponding to does not mean identical to four decimal places. Corresponding is a coordinate term, not a term of precision. Your Honor, respectfully, in this scenario, I would disagree in the sense that there may be stored data that's being used to go through the measurement verification process. This claim doesn't preclude that. This claim doesn't preclude going into a historical database and saying, last week when it was 75 degrees out, Fahrenheit, this is how much AC you used, you know, AC power you used from 4 to 5 p.m. There's nothing wrong with that. But what this claim is saying is let's do better. Let's generate measurement and verification data. In other words, data that's going to be used in the algorithm, corresponding to the reduction that occurs upon disabling today. And that's what element 1B and 1C together, I think, require, is generating the data that's being used for measurement and verification upon disabling the power today, at the time. So, for example, I mean, are you saying that you obviously don't need, during the downtime, to measure how much power is being used? Because you know what it is, it's zero. So you want to measure the temperature during that hour-long downtime? Well, measure what? Well, great question, Your Honor. I mean, again, I think ambient temperatures could be important, right? An HVAC wouldn't kick on. If your set point is 64 and it's 62 outside, and AC, you know, really low setting, it's 62 outside, it wouldn't kick on anyway. So is that really, you know, as you said, Your Honor, yeah, the power drawn is zero, but if it wouldn't have been on anyway, you don't get credit for that. So I think there are things like that. And, in fact, because these are devices that are under a consumer control, a consumer can go back, yeah, sure, the utility, Dominion Electric, reduced the set point on my thermostat because I've subscribed to this demand response period. But you know what? Everybody's really hot here. We're going to manually adjust it. So there's certain things that could be going on during the period of, you know, reduced power that affect the counterfactual. They go into that. And I know, Your Honors, I'm way late. Okay. Well, let's hear from the other side. Good morning. May it please the Court. CAUSM's due process argument is a non-issue because it lacks standing to raise it and because CAUSM never asked the Board to consider the ownership issue, such that the issue was waived. With respect to the second argument raised by CAUSM, the construction of generating measurement and verification data, it fares no better. The Board correctly rejected the idea that the claim requires a power measurement to be made during the cutoff period. In fact, the 268 patent itself describes collecting power measurements before a cutoff period because that is what is used to determine what energy was saved. And I'll also note, despite CAUSM's argument to the contrary, the 268 patent and specifically the embodiment relied upon by the parties, does not describe a power measurement during the cutoff event. For those reasons, there's simply no support for the claim construction issue. And even if we could get past those issues, we still have the factual findings by the Board that the term measured and verified as used in Ehlers is describing measurement and verification as used in the claim. And therefore, however we understand this terminology, Ehlers suggests or teach that requirement. For those reasons, the decision below should be upheld. With that, perhaps... Can I just clarify, did the Board say even if measurement during the event is required, Ehlers teaches that? No, Your Honor. What the Board said, and this is in the appendix at 41 and 42, is that the use of measured and verified in Ehlers is a teaching of the term of art measurement and verification. Thus, the measurement and verification as used in the claim is also what's being taught in Ehlers. Because we're talking here about a term of art, that term of art is used in the claim and used in Ehlers has to be co-extensive, has to be the same thing. That's what the Board found. I'm not sure how that somehow avoids the question of claim construction, whether this terminology requires measurement during the event. The issue is that the term, the full term being construed is measurement verification corresponding, I guess the exact language, measurement and verification data corresponding to the reduction in construed power. So the most important, what the Board focused on there is what does that mean? Measurement and verification data corresponding to reduction in power. And what the Board found is that term overall is talking about, it's not described or defined in the patent. It is an understanding of what is used in the art. So whatever that understanding is, it would be suggested in Ehlers. Do you think that language has a time requirement in it? No, it does not have a time requirement. Why not? Well, I think for purposes of claim construction, we first start with the intrinsic record. So if we look at the 268 patent, what the 268 patent describes, starting at column 7 and then going on to the embodiment further relied upon in column 21, is that there is a measurement in advance of the event. And specifically, as cited in our brief, page 6, column 7, lines 11 through 27 makes this clear. And I'm going to point to two quotes from that section. I see you're saying, I think you're saying the plain language itself doesn't put a time limit in it and that's supported by the specification which has a preferred embodiment that actually has the measurement done beforehand. Correct. Okay. And what that says is that the power management system determines the amount of steady state power each device consumes when turned on and logs the information in a database. It goes on to then explain, because the amount of power consumed by each specific load is known, the system can determine precisely which loads to turn off. What this is describing is measuring power of the devices, the participating devices, and then in advance of the event deciding which ones to turn off depending on how much energy you need to save. So there's a measurement in advance followed by a decision based on what to turn off, and then as discussed in the more cited two sections in column 21 of the patent, you measure how long the device was off. Energy savings is simply a function of the time the device was off and the power consumption as measured before the device was turned on. It's the baseline referred to in the board's decision. Those are the only two things you need. What does this device use power-wise and how long was it off? Energy savings is a function of those two things. While COSM seems to argue that there's a requirement for a measurement during, you'll actually not find in the specification any description of a specific power measurement occurring during the event. The power measure occurs prior to the event. So getting back to claim construction, the question is how can we adopt a claim construction that requires a measurement during and saying a measurement before doesn't count when the specification describes the measurement before and doesn't describe it during. That would be a claim construction that would contradict the intrinsic record, not be supported by it. What about a measurement after? Does a measurement after have to take place too? No measurement after has to take place. From a point of view of how do you have enough information to calculate measurement verification, you need the power that that device would use had it been on, how long was it off. Ultimately, those are the only two things that you need. Now, there are measurement and verification systems that don't turn devices off. This claim requires disabling power. Some measurement and verification simply throttle power. Think of a fan that was on high and you turned it down to low. There you might actually want to do a measurement during, and there's nothing precluding a measurement during. The question is whether it's required by the concept of measurement verification or the claims itself, and it is not required. You could do whatever else you want to do to try and make it the best determination of savings that you would like, but it is not a requirement. What about the example that your counterpart noted about the utility company wants to and sends some signals to turn off the air conditioning for the next two hours. But people in the house, after 15 minutes, 20 minutes or something, say not acceptable. I'm now going to turn it on. Doesn't there have to be simply a measurement of how much during the hoped-for two-hour turnoff it was actually off? That would be a procedure that a company might want to put in place. I will note that the patent itself says that what is required by a measurement verification program is ultimately to be determined by a governing body or a power company. A company can decide we want more, and the patent says that governing body might decide that for this particular program it wants more. But that does not put in the specification a specific requirement that there must be more. Sure, you can do whatever you want. You can have added information. The question is whether or not the claim says you have to absolutely do it. And I think the fact that the specification allows that whatever the program would be can be decided later is a telling indication that there are not specific requirements to that example that you gave, Your Honor. I just don't remember this. Did the board make anything of a notion that actually the term corresponding has a whole lot of wiggle room in it? That is an argument that it's a term of some breadth. The correspondence doesn't have to be, as I said before, to three decimal places of accurate. Did the parties argue about that? No, that's not as far as I can recall from the review of the record. I don't believe that the board focused on the term corresponding. I think what the parties and the board focused more on is that the idea, as you pointed out earlier, the counterfactual. You can't actually measure savings while a device is off. You have to have some sort of historical notion of what that device uses, know how long it was off. So in that case, you are making a determination of what the data you're using corresponds to what the reduction was. That's going to be historical data. It's going to be time. The board did discuss that, but there was not a specific, as far as I can recall, determination of corresponding is broad and therefore, as you would put it. With that, if absent any further questions about claim construction, I can address the notice argument, if that would be helpful to the court. And I thank you for your patience for hearing these three cases in a row. I'm sure there's been plenty of information provided already. I will note that the argument for the due process, the alleged due process violation in this case, is interesting in that it is a bit of a catch-22 for COSM. And that is, the argument is essentially that COSM may not own the patent, and if it doesn't own the patent, the patent owner wasn't given notice. That is simply not an injury to COSM. COSM has not disputed that it did not have notice. It has not disputed that the patent office allowed it to participate in this proceeding, that it was fully heard. So either COSM owns the patent, in which case there is no notice problem, or COSM doesn't own the patent, in which case the injury that it alleges doesn't belong to COSM, it belongs to some other party. I don't see any way around that catch-22 that this issue resolves itself, because either way you figure it out, the argument for COSM doesn't work. And I'll also note that COSM's argument is essentially that the flaw in the final written decision is that the board didn't make a ultimate determination on ownership, who owns the patent. The problem with that, separate and apart from what I just addressed, is that no party, COSM in particular, asked the board to make that determination. So the question is, how could we fault the board for not making a determination that neither party asked it to make? There can't be a flaw in the decision from that point of view. And in fact, if COSM really wanted this... COSM must have raised some sort of objection to your side, ECOB, for bringing this challenge and identifying COSM as the patent owner, when it knew that ECOB doesn't believe that COSM is the patent owner. It did raise that, and it was in the context primarily of an institution. The argument pre-institution was that there should not be an institution because Section 35 U.S.C. 312, I think it's A5, was not met, because there was not proper service, not service on the patent owner. That was the argument pre-institution. The argument post-institution was pretty much the same argument, but it was, well, you should basically end this case and not get to a final written decision. The response to that, and the correct response to that, is that's not what the statute requires. The statute requires specifically that the petition must be served on the patent owner or, if applicable, the designated representative of the patent owner. The factual argument that COSM makes is that the petition was served on COSM, not the patent owner. That is not accurate. The petition was served on the correspondence— I'm sorry, I'm sorry. COSM could not possibly have said that the petition was not served on the patent owner. It was served on COSM. COSM thinks it's the patent owner. It could not possibly have said that. What it said was the petition was not served on another person that the petitioner believes is the patent owner, incorrectly believes is the patent owner. But so what? 312 doesn't require that. I completely agree. The only point I was going to raise with respect to 312 is it doesn't even require that service be made on the patent owner. It requires that service be made on the patent owner or, if applicable, the designated representative of the patent owner. In this case, the petition was served on the correspondence address of record, which was a law firm. Who that law firm represents is between the law firm and its client. So all ECOB could do is serve the registered agent listed in the records for the U.S. Patent Office because that's what the statute requires. As to whether or not— Is COSM on the current PTO books as assignee? Yes, Your Honor. Was that part of this record? Yes, Your Honor. It's a matter of public policy? Yeah. It was raised here that that is the assignment address. The assignee and the correspondence address of record are of record in this appeal. In any event, for those reasons, we don't believe there is any problem with the service or any viable due process argument that could be raised by COSM in this case. And absent any further questions, I'll leave the rest of the briefs. Okay. Thank you very much. Thank you. Yes. Let's give Mr. Howley two minutes. Thank you, Your Honor. I will probably use less than that if I can. Very quickly, in terms of whether there is disclosure in our patent of measurement and verification data being generated during the period of reduced power, there is. And Block 816 of Figure 7 of our patent does have, after a turnoff transaction is sent, log amount of power and timestamp in ALS, that's the system, database for each ALC, power-consuming device, reduced. There is this logging process that goes on. So I just want to say that if there's a question of whether there's specification support for what we're saying about corresponding to, there is, and I would say at least this portion. Judge Toronto, I think you asked, did the Board evaluate claim or Element 1C under our interpretation of the claim? And the answer is correct that counsel gave. They did not engage in that analysis. And the last point I'd just like to say is while we are causing this assigning of record at the PTO, there was a quick claim deed that was logged at some point in favor of residio from another entity somewhere, I think Landis and Gear, GYR Gear. Is that a record in this case? Not in this case, Your Honor. Correct. But just to say there is something on the title that looks fishy. But cause and maintains, we do own it in that that does not change. Your Honors, I appreciate all your time today. Thank you. Let's go to the questions. Thank you. Case is submitted.